IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| TERRANCE C. HAWKINS, | ) | Civil Action No. 3:09-1254-MBS-JRM |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY | ) | |
| Defendant. | ) | |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

Plaintiff filed applications for SSI and DIB on April 3, 2006, alleging disability since June 4, 2005. Plaintiff's applications were denied initially and on reconsideration, and he requested a hearing before an administrative law judge ("ALJ"). After a hearing held on March 12, 2008, the ALJ issued a decision denying benefits and finding that Plaintiff was not disabled within the meaning of the Act because he was able to perform his past relevant work as a cashier.

Plaintiff was forty-three years old at the time of the ALJ's decision. He has a twelfth grade education with past relevant work as a cashier in a fast-food restaurant, cook, and hotel bellman. (Tr. 147, 151). Plaintiff alleges disability due to diabetes and diabetic neuropathy. (Tr. 98-108).

The ALJ found (Tr. 21-29):

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.   The claimant has not engaged in substantial gainful activity since August 31, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b), 416.971 *et seq.*).

3.   The claimant has the following severe impairments: insulin-dependent diabetes mellitus and new onset seizure disorder (20 CFR 404.l520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). The claimant can lift and carry 50 pounds occasionally and 25 pounds frequently. The claimant can stand for 6 hours in an 8-hour workday, walk for 6 hours in an 8-hour workday, and sit for the remaining 2 hours in an 8-hour workday. The claimant would need to avoid heights and moving machinery.

6.   The claimant is capable of performing past relevant work as a cashier at a fast food restaurant. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from August 31, 2005, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

On March 25, 2009, the Appeals Council denied Plaintiff's request for review, making the decision of the ALJ the final action of the Commissioner. Plaintiff filed this action on May 13, 2009.

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42

U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

## MEDICAL EVIDENCE

On April 4, 2004, Plaintiff was treated at Roper Hospital in Charleston, South Carolina for complaints of elevated blood sugar and "not feeling well." He explained he did not take his insulin because he did not want to be late for church and had not taken his last two or three doses. Plaintiff was treated with intravenous fluids and insulin and diagnosed with hyperglycemia and noncompliance with medication and diet. Tr. 370-373.

After passing out, Plaintiff was taken to Roper Hospital on March 3, 2005. He was treated with intravenous fluids and insulin and discharged with a diagnosis of mild diabetic ketoacidosis. Tr. 366-367.

Plaintiff was treated at the Fetter Family Health Center ("FFHC") in Charleston, South Carolina on March 24, 2005. He complained of a six-month history of foot-and-ankle pain, reported he had to constantly stand at work, and said his blood sugar level rarely went above 200. He was diagnosed with type II diabetes mellitus, foot pain, and a high uric acid level. Tr. 267.

After passing out at work, Plaintiff was treated at the emergency room at the Medical University of South Carolina ("MUSC") on June 27, 2005. He was subsequently admitted to the hospital. Examination revealed that Plaintiff had 4+/5 strength in all extremities, no neurological

3

deficits, and no edema in his extremities. A chest x-ray showed no acute cardiopulmonary disease, and clinical examination revealed no neurological or cardiovascular abnormalities involving the lower extremities. Plaintiff responded well to insulin and at discharge on June 28, 2005, his diagnoses were diabetic ketoacidosis, presumptive hyperlipidemia, noncompliance secondary to financial concerns, and diabetes mellitus. Tr. 249-251, 259-260.

Plaintiff was treated at MUSC for complaints of pain in his feet and left leg on August 5, 2005. Diabetic neuropathy and hyperglycemia were diagnosed. Tr. 257-258. On August 17, 2005, Plaintiff complained of not feeling well after not taking insulin for several days. Examination at MUSC revealed an ulcer on a left foot toe, full motor strength, normal reflexes, and hypersensitivity in both lower extremities. Tr. 255-256. On September 12, 2005, Plaintiff complained at MUSC of pain in his legs, feet, back, and groin. He was diagnosed with poorly controlled diabetes and neuropathy. Tr. 253-254.

Plaintiff was treated at Roper Hospital for complaints of weakness, lightheadedness, and abdominal pain on October 7, 2005. He admitted he had not been taking insulin on a routine basis. His blood-sugar level was over 500. Uncontrolled diabetes and impending diabetic ketoacidosis were diagnosed by Dr. William Baly. Plaintiff was admitted to the hospital, treated with intravenous fluids and insulin, and discharged in stable condition on October 9, 2005. Tr. 207-216.

On November 5, 2005, Plaintiff was treated at Roper Hospital for hyperglycemia. His blood-sugar level upon admission was 575. With the exception of generalized weakness, no abnormalities were noted upon examination. Tr. 220, 222, 225-226.

After falling and striking his head, Plaintiff was treated at Roper Hospital on December 16, 2005. He denied chronic falls, numbness, blurry vision, or loss of consciousness. Examination

revealed symmetric reflexes, normal muscle strength and tone, full range of motion in his neck, and no evidence of external trauma. Tr. 233-240. A CT scan of Plaintiff's head revealed no intracranial injuries, and x-rays of his cervical spine were normal. Tr. 243-244.

On January 7, 2006, Plaintiff was treated at the FFHC for pain in his back and legs and numbness in his hands and feet. He was given prescriptions for Neurontin and Toradol. Tr. 264. X-rays of his cervical and lumbar spine revealed no abnormalities. Tr. 247, 269. He complained of pain in his lower back, legs, and hands on May 16, 2006. A physician at the FFHC noted that Plaintiff walked with a cane and received free insulin at MUSC. Tr. 262.

On June 16, 2006, Plaintiff sought treatment at Roper Hospital for an injury to his left knee and ankle resulting from a fall. X-rays of his left knee and ankle were negative, and examination revealed no swelling or contusion. Plaintiff was diagnosed with a sprained left knee and ankle. Tr. 273, 297-299.

On July 28, 2006, Dr. Katrina B. Doig, a state agency medical consultant, reviewed Plaintiff's medical records and assessed his physical residual functional capacity ("RFC"). Dr. Doig opined that Plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk for six hours in an eight-hour day; sit for six hours in an eight-hour day; occasionally climb stairs and ramps, but never scaffolds and ladders; occasionally use hand and foot controls; and should avoid concentrated exposure to hazards. Dr. Doig noted that Plaintiff had a history of diabetic neuropathy, often with normal examinations, and poorly controlled diabetes, at times caused by noncompliance. Tr. 279-286.

Plaintiff was admitted to Roper Hospital on August 24, 2006, due to several recent seizures and markedly elevated blood sugar. Plaintiff stated he had been compliant with his medication, but

5

not his diet. Dr. Baly noted that Plaintiff had poorly controlled diabetes due to poor compliance with diet and a history of diabetic neuropathy, well controlled on Neurontin. Upon examination, Dr. Baly noted that Plaintiff had normal strength in all extremities, tenderness in the lower extremities below the knees, and decreased ankle reflex. A CT of Plaintiff's head and an EEG were unremarkable. Plaintiff's blood-sugar level dramatically improved with intravenous insulin and fluids. Dr. Baly prescribed Dilantin, insulin, and a diabetic diet. Tr. 290-294.

On September 6, 2006, Plaintiff was treated with Dilantin and Ativan at Roper Hospital after a seizure. Examination revealed that Plaintiff had normal speech, strong symmetric hand grip, normal gait, and no muscle weakness. Tr. 302-305. He returned to Roper Hospital on September 24, 2006 after a seizure. Dilantin was administered. Examination revealed that Plaintiff had normal strength, full range of motion, and no swelling or edema in his extremities. A CT scan of Plaintiff's head showed mild sinus inflammation. Tr. 306-308, 310.

Plaintiff was treated at Roper Hospital for a seizure on October 3, 2006. It was noted that he had a history of fairly well-controlled seizures, with an average of several seizures per year. Physical examination revealed that Plaintiff had no motor or sensory deficits. Plaintiff was diagnosed with insulin dependent diabetes mellitus, hypoglycemic reaction to medication, grand mal seizure, and seizure disorder. Tr. 311-313, 317. He returned to Roper Hospital on October 11, 2006, after another seizure. Physical examination revealed no motor or sensory deficits, normal speech, normal mood and affect, and good muscle strength in all extremities. Tr. 323-327. On October 23, 2006, Plaintiff was treated at Roper Hospital for a seizure which reportedly resulted in his falling and striking his head. X-rays of Plaintiff's cervical spine revealed no fractures or soft tissue swelling.

A positive drug screen for cocaine was noted. Plaintiff was diagnosed with grand mal seizure, neck pain, and seizures. Tr. 338-343, 347, 353.

Plaintiff was treated at Roper Hospital on November 5, 2006 for complaints of general malaise; polyuria; and pain in his back, abdomen, and chest. Examination revealed tachycardia, hypertension, elevated blood sugar, intact range of motion in the extremities, and no muscle weakness. Plaintiff's back and abdominal pain resolved when his blood sugar level returned to normal, and his chest pain improved after he received Motrin. Tr. 274, 276-277.

On November 25, 2006, Dr. William Crosby, a state agency medical consultant, reviewed Plaintiff's medical record and assessed Plaintiff's RFC. Dr. Crosby opined that Plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently; sit for six hours and stand and/or walk for six hours in an eight-hour day; occasionally balance and climb ramps and stairs (but never climb scaffolds or ladders); frequently stoop, kneel, crouch, and crawl; and should avoid all exposure to hazards. Dr. Crosby noted that the records showed no motor weakness, a normal gait, noncompliance with diabetic treatment, and poor control of seizures with evidence of cocaine use on October 26, 2006. He thought that adequate seizure control could be expected if Plaintiff complied with treatment. Tr. 354-361.

On December 5, 2006, Plaintiff was treated at Roper Hospital for a seizure. Tr. 474-476. He was treated there for acute symptomatic hypoglycemia and seizure activity on January 23, 2007. Plaintiff reportedly had not taken his insulin because he misread his glucometer. Tr. 471. On March 12, 2007, he was treated at Roper Hospital with Dilantin and Acetaminophen for recent seizure activity and headache. Examination revealed no motor or sensory deficits. Tr. 465-468.

On May 6, 2007, Plaintiff was treated at Roper Hospital for complaints of right-flank and low-back pain. Examination revealed muscle spasm in the low back, no sensory deficits, normal reflexes, and no evidence of lower extremity weakness. He was diagnosed with diabetes, back pain, lumbar stain, and hyperglycemia. Tr. 461-464. Plaintiff returned on July 6, 2007, after reportedly falling and striking his head during a seizure. Examination revealed tenderness and muscle spasm in his neck. His diagnoses included seizure disorder, diabetes, cervical strain, and head injury post seizure. Tr. 458-460.

Plaintiff was admitted to Roper Hospital on July 16, 2007, after falling and striking his head during a seizure. Laboratory results showed a supratherapeutic level of Dilantin. Dr. Bumgartner, a neurologist, diagnosed Plaintiff with seizure disorder of unclear etiology, Dilantin toxicity, and diabetic peripheral neuropathy. An MRI of Plaintiff's brain was essentially unremarkable. Examination revealed an ataxic gait, 4/5 strength in the lower extremities, stocking-glove sensory deficit in the lower extremities, and muscle atrophy in both calves. Dr. Bumgartner prescribed Depakote to replace Dilantin; physical therapy for deconditioning, which included the use of a rolling walker; and an increased dose of Neurontin for Plaintiff's significant pain from diabetic peripheral neuropathy. At the time of his discharge on July 26, 2007, Plaintiff was seizure free and asymptomatic. Tr. 449-450.

Plaintiff returned to Roper Hospital on September 4, 2007, complaining about an injury to his right upper arm after a fall. Examination revealed no contusion or swelling of his right arm or other evidence of significant external trauma. Tr. 444-448. Plaintiff complained of a seizure after missing a dose of Depakote on September 14, 2007. While in the emergency room, he had two more seizures. He was treated with Depakote and Lorazepam. Tr. 440-443. He was treated at Roper

Hospital on September 15, 2007, after reportedly having five seizures that day. Plaintiff's Depakote level was subtherapeutic upon admission. Dr. Ojo M. Oladimeji noted that Plaintiff had nonataxic gait, coherent speech, normal peripheral pulses, and no neurologic deficits. Tr. 433-434, 438. On September 25, 2007, Plaintiff complained of seizures. He improved after treatment with Depakote and was discharged with a one-week supply of medication. He was advised to follow up with "the clinic" to try to obtain medications. Tr. 417-418

After striking his head in a fall after his left leg gave out on him, Plaintiff was treated at Roper Hospital on October 17, 2007. Examination revealed no external signs of trauma. A CT scan of his head revealed no evidence of skull fracture, and x-rays of his cervical spine revealed no significant degenerative changes. Tr. 413, 416. He returned on October 21, 2007, after a seizure. It was noted that Plaintiff had low blood sugar and probably had a hypoglycemic event with seizure. Examination revealed that Plaintiff had adequate strength and full range of motion in his extremities. Tr. 428-431. Plaintiff returned to Roper Hospital for treatment for a seizure on October 24, 2007. Plaintiff had run out of medication and explained that he had tried on multiple occasions to obtain medication through patient assistance programs without success. Significant postictal confusion was noted. His neurologic cardiac, and pulmonary examinations were normal, and his muscle strength was strong and equal in all extremities. Tr. 419-420.

On November 7, 2007, Plaintiff was treated at Roper Hospital for hand injuries that occurred during a fall. X-rays revealed fractures of the fifth metacarpal in each hand which were stabilized with splints. Tr. 407, 409. He received a prescription for Dilaudid on November 10, 2007, and a prescription for Percocet on November 15, 2007. Tr. 399-406.

9

Plaintiff was treated at Roper Hospital on December 2, 2007 for a seizure. A history of poor compliance with prescribed medication was noted, and examination revealed no motor or sensory deficits and a full range of motion of all extremities. Plaintiff was treated with Lorazepam and Dilantin. Tr. 394-397. He returned on December 11, 2007, at which time he was treated for hypoglycemia and a seizure. Examination revealed normal muscle strength, normal speech, no neurologic deficits, and splints on both wrists for treatment of hand fractures. Intravenous fluids, Lorazapam, and Depakote were administered. Tr. 389-394.

Dr. Marcus Briones followed up on Plaintiff's hand fractures on January 18, 2008. He found that Plaintiff had some mild rotational deformity and stiffness in his left hand. Tr. 378.

Plaintiff was admitted to Roper Hospital for seizure disorder breakthrough, upper respiratory tract infection, and medication noncompliance on January 27, 2008. A low Depakote level was found. Plaintiff was discharged in stable condition on January 30, 2008. An increased dose of Depakote was prescribed by Dr. Oladimeji. Tr. 382-388.

On March 6, 2008, Dr. Oladimeji completed an "Attending Physician's Statement," in which he opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; sit for two hours and stand or walk for zero to one hour in an eight-hour day; needed an assistive device to ambulate; should avoid dust, fumes, and extremes of temperature and humidity; could never operate motor vehicles or work around hazardous machinery; could rarely bend and/or stoop; and could occasionally perform push-pull movements with the arms and legs. Tr. 477, 480. Dr. Oladimeji identified seizure disorder, diabetes, and peripheral neuropathy as the basis for Plaintiff's restrictions. Tr. 477-480.

## HEARING TESTIMONY

Plaintiff testified that he stopped working as a cashier in a fast food restaurant in 2005 because he could not stand due to neuropathy in his legs. Tr. 40. He said he was unable to afford his medications, sometimes had difficulty obtaining samples, and took less than the full dosage to make them last longer, which caused him to have seizures. Tr. 42-43. Although Plaintiff was able to obtain insulin through a patient assistance program, but was not able to get free Neurontin or seizure medication. Tr. 57. Plaintiff said that he experienced pain in his legs and feet constantly and cramps in his legs if he sat too long. Tr. 43. He said he had been using a cane to walk since the middle of 2006, and had used a walker and crutches in the past. Tr. 44-45. Plaintiff reported that pain and numbness in his legs caused him to fall. Tr. 44. He reported memory problems which started in 2006.

Plaintiff testified that he was unable to walk any distance without a cane. Tr. 48. He thought he could lift fifteen pounds and carry about ten pounds. During the average day, Plaintiff reportedly spent most of his time lying down in order to elevate his feet. Tr. 51. Plaintiff stated that he did no sweeping, vacuuming, dishwashing, cleaning, or driving, and did not read much because his eyes were going bad due to diabetes. Tr. 53-55.

## DISCUSSION

Plaintiff alleges that the ALJ's decision is not supported by substantial evidence, the ALJ erred in disregarding the opinion of his primary treating physician, and the ALJ failed to properly

evaluate his credibility. The Commissioner contends that decision that Plaintiff was not disabled under the Social Security Act is supported by substantial evidence[1] and free of legal error.

A. Treating Physician/Substantial Evidence

Plaintiff asserts that the ALJ's decision is not supported by substantial evidence because there is no evidence of record from a treating or examining physician that is inconsistent with the opinion of Dr. Oladimeji (who was Plaintiff's treating physician from March 2007 to January 2008). He argues that the ALJ erred in giving more weight to the opinions of the non-examining consultative physicians than his treating physician, especially where the consultative reports were rendered without the benefit of all of Plaintiff's treatment records. Plaintiff argues that, contrary to the ALJ's findings, the medical records reveal that Plaintiff was diagnosed with diabetic neuropathy on numerous occasions, clinical findings indicated findings of this impairment, and there are notations in the medical record as to Plaintiff's use of assistive devices. The Commissioner contends that the ALJ's decision to discount the March 2008 opinion of Dr. Oladimeji is supported by substantial evidence because the evidence did not establish that Plaintiff had motor or sensory deficits or difficulty with ambulation. Additionally, the Commissioner contends that Dr. Oladimeji's opinion is contradicted by the opinions of the two state agency medical consultants. The

---

[1]Substantial evidence is:
> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

Commissioner contends that the evidence Plaintiff cites as supportive of his limited ability to walk is only two isolated pieces of evidence.

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. § 416.927(d)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527. Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p.

The ALJ stated that he gave little weight to Dr. Oladimeji's opinion "because it was not supported by the clinical evidence of record." Tr. 26. He further noted that the medical examinations did not show motor sensory deficits or difficulty with ambulation. Id.

13

The ALJ's decision to discount Dr. Oladimeji's opinion is not supported by substantial evidence. It appears that the ALJ discounted this opinion in large part based on the opinions of the state agency physicians (Drs. Doig and Crosby). These reports, however, were made in July 2006 and November 2006 (Tr. 279-86, 34-361) and thus failed to take into account a large portion of Plaintiff's applicable medical records including subsequent emergency room visits and hospitalizations, the findings of neurologist Dr. Bumgartner in July 2007, and hospital visits in October and November 2007 during which Plaintiff was treated for hand fractures resulting from neurologic deficits (Tr. 408). Although the ALJ appears to have relied on the opinions of the non-treating, non-examining physicians, he does not appear to have even fully credited their opinions as he disagreed with their opinions that Plaintiff would be limited to some extent by diabetic neuropathy.

Dr. Oladimeji treated Plaintiff at the FFHC and was also Plaintiff's admitting or discharge physician for his hospital visits in July 2007, September 2007, and January 2008. The medical records, contrary to the ALJ's findings, indicate numerous diagnoses of neuropathy as well as a number of specific examination findings of such. Although there is no specific note of a cane being prescribed, there are notations concerning the use of assistive devices and the prescription of physical therapy including of the use of a rolling walker (which is an assistive device).

Plaintiff was diagnosed with diabetic neuropathy on August 5, 2005. Tr. 256-258. In an August 17, 2005 visit to MUSC, Plaintiff was found to have hypersensitivity in both lower extremities. This hypersensitivity was interpreted by the treating physician as paresthesia and provided a diagnosis of diabetes with peripheral neuropathy. Tr. 256. On September 12, 2005, the records indicate that Plaintiff was suffering from increased neuropathic pain. He was noted to have

14

fallen due to neuropathy. Tr. 254. Plaintiff was noted as using a crutch on his visit to the FFHC on January 7, 2006. He complained of numbness in his hands and feet. A physician noted reduced sensation in Plaintiff's feet. Tr. 264. On May 16, 2006, a physician at the FFHC noted that Plaintiff walked with a cane. Tr. 262. During Plaintiff's August 2006 hospital admission, Dr. Baly found tenderness in Plaintiff's lower extremities below the knee and decreased ankle reflex. Tr. 293. Dr. Bumgartner, a neurologist, diagnosed diabetic peripheral neuropathy and noted symptoms of ataxic gait, 4/5 strength in the lower extremities, stocking-glove sensory deficit in the lower extremities, and muscle atrophy in both calves in July 2007. Physical therapy for deconditioning (including the use of a rolling walker) as well as an increased dose of Neurontin for significant pain for diabetic peripheral neuropathy were prescribed. Tr. 449-453. In November 2007, Plaintiff was treated for fractured hands from trying to break a fall after he reportedly lost balance. A physician wrote that "[u]nderlying neurologic deficits leads to chronic falls." Tr. 408. Plaintiff's diagnoses included diabetic neuropathy. Tr. 409. It was noted on November 15, 2007 that Plaintiff could not feel well with his feet because of neuropathy which caused him to brace himself with his hands. Tr. 399.

B.     Credibility

Plaintiff asserts that the ALJ failed to properly evaluate his credibility. Specifically, he argues that the ALJ's decision to discount his credibility because his allegations are inconsistent with the medical evidence of the record (Tr. 24) is contradicted by his multiple emergency room visits and hospital admissions for seizures and his treating physicians' findings concerning his seizure disorder and peripheral neuropathy. He also argues that the ALJ erred in finding that his credibility was diminished by his reported daily activities of attending church, watching television, visiting friend/family three times a month, and eating out one time a month (Tr. 27). Plaintiff appears to

argue that these activities are not indicative of an ability to perform medium work. The Commissioner contends that the ALJ adequately evaluated Plaintiff's credibility and correctly discounted it based on the numerous references to benign clinical findings, Plaintiff's lack of compliance with treatment, evidence of cocaine use in October 2006, and the absence of evidence that Plaintiff's use of a cane for ambulation was prescribed by a physician.

In assessing credibility and complaints of pain, the ALJ must: (1) determine whether there is objective evidence of an impairment which could reasonably be expected to produce the pain alleged by a plaintiff and, if such evidence exists, (2) consider a claimant's subjective complaints of pain, along with all of the evidence in the record. See Craig v. Chater, 76 F.3d at 591-92; Mickles v. Shalala, 29 F.3d 918 (4th Cir. 1994). Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges he suffers. A claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

The ALJ appears to have discounted Plaintiff's credibility based on his interpretation of the medical records as not showing signs of diabetic neuropathy or any need for an assistive device as well as his discounting of Dr. Oladimeji's opinion. As noted above, this is not supported by substantial evidence. Further, although the ALJ appears to discount Plaintiff's credibility in part due to his noncompliance, the ALJ fails to take into consideration the numerous notations in the record

indicating that this was due to Plaintiff's inability to afford his medications.[2]  Thus, it is recommended that this action be remanded to allow the ALJ to evaluate Plaintiff's credibility in light of all of the evidence.

## CONCLUSION

The Commissioner's decision is not supported by substantial evidence.  This action should be remanded to the Commissioner to properly evaluate Plaintiff's credibility and the opinion of his treating physician (Dr. Oladimeji).

RECOMMENDED that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and 1383(c)(3) and the case be remanded to the Commissioner for further administrative action as set out above.

Joseph R. McCrorey
United States Magistrate Judge

August 23, 2010
Columbia, South Carolina

---

[2]While a claimant's failure to obtain medical treatment that he cannot afford cannot justify an inference that his condition was not as serious as he alleges, see Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir.1986), an unexplained inconsistency between the claimant's characterization of the severity of his condition and the treatment he sought to alleviate that condition is highly probative of the claimant's credibility.  See 20 C.F.R. § 416.929(c)(4); Mickles v. Shalala, 29 F.3d at 929-30.